*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0417p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

MICHAEL STEVEN HOLDER,

        *Petitioner-Appellant,*

    *v.*

No. 07-1440

CARMEN PALMER,

        *Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-73245—Victoria A. Roberts, District Judge.

Argued: June 17, 2009

Decided and Filed: December 9, 2009

Before: MOORE and GILMAN, Circuit Judges; PHILLIPS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Ariel B. Waldman, WILMER CUTLER PICKERING HALE and DORR LLP, Washington, D.C., for Appellant. Mark G. Sands, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Ariel B. Waldman, WILMER CUTLER PICKERING HALE and DORR LLP, Washington, D.C., for Appellant. William C. Campbell, Eric Restuccia, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

    PHILLIPS, D. J., delivered the opinion of the court, in which GILMAN, J., joined. MOORE, J. (pp. 20-26), delivered a separate dissenting opinion.

_____

[*] The Honorable Thomas W. Phillips, United States District Judge for the Eastern District of Tennessee, sitting by designation.

---

**OPINION**

---

THOMAS W. PHILLIPS, District Judge.  Petitioner was convicted in a jury trial of sexual penetration with an uninformed partner by a person infected with acquired immunodeficiency syndrome (AIDS), in violation of Mich. Comp. Laws § 333.5210, and sentenced to 120-180 months imprisonment.  Petitioner appeals the district court's judgment denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner contends that he received ineffective assistance of counsel when his counsel failed to challenge the seating of jurors whose *voir dire* responses showed them to be racially biased.

We conclude the district court correctly found that the state courts' decisions reasonably comport with clearly established federal law.  For the following reasons, we **AFFIRM** the decision of the district court and **DENY** the Writ.

**I.**

Holder was charged by the State of Michigan with sexual penetration without informing his partner that he had the Human Immunodeficiency Virus (HIV), and brought to trial in Bay County Circuit Court.  Holder is African-American.  His partner, Monica Kosecki, is white.

Holder's counsel prepared a questionnaire that the trial court agreed to administer to prospective jurors, to determine whether they might harbor prejudices that would disqualify them from a trial in which an African-American man was accused of a sexual crime against a white woman.  Five of the jurors revealed possible biases against African-Americans or against Holder in their responses during *voir dire*.  Relevant portions of the *voir dire*, including the efforts the court and Holder's counsel made to rehabilitate these jurors, follow:

A.      Examination of Juror Flynn

> THE COURT: Questions were asked [in the jury questionnaire] whether or not any – either you or a member of your family was a victim of a crime and, if so, whether or not the other person was of a different race. And you said – answered "yes," and that sometimes you view other races as – as below your standards because of the acts (sic) taken place.

When the trial court questioned Juror Flynn further about the crime,  she stated that a Hispanic man had stolen something from her father.

> THE COURT:  Okay.  And you made the comment that you think – black men deal with hate or revenge with violence more so than other races.  The fact that Mr. Holder, the defendant who's on trial, is black, is that going to have any effect on how you would judge this case and how you – you would decide on a verdict?
>
> JUROR FLYNN:  No, I don't believe so at all.
>
> THE COURT:  Okay.  Can you see if I read these, why it might appear that you might be prejudiced against a Hispanic or a black person?
>
> JUROR FLYNN:  Ya, I can – I can see that, yes.
>
> THE COURT:  Okay.  But you don't feel that you are?
>
> JUROR FLYNN:  No, not at all.
>
> THE COURT:  Would it be safe to kind of say that you kind of view it as a fact that maybe more crimes are committed by a non-Caucasian than Caucasian, do you – is that the way you feel?
>
> JUROR FLYNN:   I believe so, yes.

The court then asked whether "that fact alone" was "gonna make [her] decide the case on [her] feelings instead of the evidence that would come in front of [her]." Juror Flynn replied that it would not, and also said that race would not affect her verdict.

> Holder's counsel later examined Juror Flynn about her answers to other questions, and the examination included the following exchange:
>
> COUNSEL:  I just want to, in my own mind, clarify an answer that you have written in your questionnaire.  And this is a – a question that I think Judge Bielawski talked to you about in – in great detail.  But I want to get a little bit more information from you about your particular answer. And that's the question dealing with the fact that – and I'll just read it so

that there's no – there's nothing that – that I don't say exactly like the questionnaire did:

The defendant in this case is a black man who is accused of having sex with a white woman without telling her that he had the HIV virus. Based upon this information, have your already formed an opinion about him and, if so, what is your opinion?

And your answer was: "Yes. This is a deadly disease. He took her life into his hands by putting her at risk. He's a horny coward."

Now, Judge Bielawski talked to you about the presumption of innocence and – and if you had to make a decision right now based upon what you know, what your – what the verdict would have to be, or what your decision would have to be.

Were you – did the word "accused," was that the word that did it for you as far as your answer?

JUROR FLYNN:   Yes, –

COUNSEL:   Okay.

JUROR FLYNN:   – definitely.

COUNSEL:  So, based upon what he's gone over previously regarding that, would you – would your answer be any different now than what you wrote?

JUROR FLYNN:   Yes, definitely . . . I believe that, yes, everyone is innocent until proven guilty.

B.     Examination of Juror Coppinger

THE COURT:  Miss Coppinger, you answered – or – the questionnaire stated that you thought that a person should stay within their own race and it saves a lot of heartache; that you don't care for basically interracial relationships.  Do you think the fact that there we – this case does involve interracial relationships, that that's going to affect how your decide the case or influence you on your verdict?

JUROR COPPINGER:  No, I don't think it would influence.  I'm more or less saying what my standard is for myself and – I have two girls – for my girls.

The court then asked the Juror Coppinger to consider what her views would be if one of her daughters began dating a black man who was "head of the business department at the college . . . a very nice person, never been married, very polite, makes a nice income,

and thinks the world of your daughter," while the other daughter was dating a white man with "long, greasy hair, earrings in his nose and his tongue and his ears, and tattoos all over his body," who, when asked what he did said "Well, Man, I'm just takin' it cool and doin' whatever." The court then asked:

> THE COURT:   And you look at the two guys and what do you think? I – if you had to choose –
>
> Would – sometimes, Miss Coppinger, would you agree that your values and your choices in life change with the circumstances?
>
> JUROR COPPINGER:   Yes.  That wouldn't be easy!
>
> THE COURT:   Pardon?  Can you –
>
> JUROR COPPINGER:   That wouldn't be easy!
>
> THE COURT:    – can you talk into the microphone?
>
> JUROR COPPINGER:   That wouldn't be easy!
>
> THE COURT:   That's right.  And it just may be that if your daughters married these two individuals which I stated, you could have one of the most wonderful son-in-laws in the world and one of the biggest bums that you ever saw in the world.
>
> JUROR COPPINGER:   That's right.
>
> THE COURT:   And, over a period of time, the issue of race may fade into the background, correct?
>
> JUROR COPPINGER:   That's true.
>
> THE COURT:   Okay.  Do you agree with that?
>
> JUROR COPPINGER:   Yes, I do.
>
> THE COURT:  Okay.  But I think from your comments there, that you'd just as soon not try that scenario, right?
>
> JUROR COPPINGER:   Yes.
>
> THE COURT:   Okay.  But going back to your questions and the issues that are going to come up in this case, is the race of the different people that are gonna testify here, is that gonna be an issue about when you decide the ultimate verdict is – is the defendant guilty or innocent?
>
> JUROR COPPINGER:   No, I don't think it'd affect my judgment.  Like I said, I'm pretty open-minded.

THE COURT:   Okay.  If you remember, I talked to one of the other jurors when she said, "I don't think."  I'm not asking what you think, I want to –

JUROR COPPINGER:   That's how I feel.

THE COURT:   Okay.  I need a commitment from you that you can assure the court that you will be fair and impartial and that race is not gonna affect your verdict.  Can you give me that commitment?

JUROR COPPINGER:   Yes, I can.

THE COURT:   And you feel comfortable doing that?

JUROR COPPINGER:   Yes.

Holder's counsel did not question Juror Coppinger.

C.     Examination of Juror Moore

THE COURT:     Regarding the questions regarding interracial relationships, you said basically "it's up to them," which means it's their business?

JUROR MOORE:   That's right.

THE COURT:   But then you went on to say they should not have children.  Why did you feel that way?

JUROR MOORE:   Well, I feel that children would be a mixed breed.  It's just some – I think that they might suffer for it down the road.  Their children would be – don't know if they're – what breed they really are!

THE COURT:  They won't know – were you gonna say you – they don't know whether they're Caucasian, black, or whatever –

JUROR MOORE:   That's right.

THE COURT:   – mix?

JUROR MOORE:   That's right, that's right.

THE COURT:   And your grandparents, were they born in the U.S.

JUROR MOORE:   No, they weren't.

THE COURT:   And where were they born?

JUROR MOORE:   Germany.

THE COURT:   Both of 'em?

JUROR MOORE:   Um hum.

THE COURT:  You aware that early on in our country, people that came over here, they felt that the Germans should only date Germans the Polish should only date Polish?

JUROR MOORE:  Probably!

THE COURT:  Okay.  And how would – how do you feel about those old ideas?

JUROR MOORE:  I – I guess nationalities are different.  I don't know why, but it's something I guess I was brought up with.

THE COURT:  Okay.  And why do you make a distinction between nationality and race?

JUROR MOORE:  The color I believe.

THE COURT:  Okay.  Just the fact that someone can see it, where nationalities you can't.

JUROR MOORE:  Yes.

THE COURT:  Okay.  And the fact that we have a black man on trial as a defendant and claiming to have had intercourse with a white woman, is that something that is going to bother or –

JUROR MOORE:  I don't think so.

THE COURT:   – affect your verdict?

JUROR MOORE:  No sir.

THE COURT:  And you're sure of that?

JUROR MOORE:  Positive.

THE COURT:  You think you can be fair and impartial?

JUROR MOORE:  Yes, I can.

THE COURT:  You're not gonna think that "I'm gonna find him guilty just because I don't think a black man should be having intercourse with a white woman?"

JUROR MOORE:  Well, like I said, I believe it's their business.

Holder's counsel did not question Juror Moore.

D.      Examination of Juror Heaslip

THE COURT:  . . . Miss Heaslip, when we asked the question about the fact that  defendant is accused of –

JUROR HEASLIP:   Yes.

THE COURT:   – a – a certain act, and you put down "I would say he's guilty." Well, first, you thought "I think he was guilty," and then you put down "I – I would say he is guilty!"

JUROR HEASLIP:   I know just readin' it, he's accused. And I didn't really think of that right away. But I couldn't accuse him without hearin', you know, –

THE COURT:   Okay.

JUROR HEASLIP:   – everybody's innocent until proven guilty.

THE COURT:   So, you read the question same as –

JUROR HEASLIP:   Yes, –

THE COURT:   Miss Loveless, right?

JUROR HEASLIP:   – yes, I did!

The court told Juror Heaslip to consider the defendant innocent until proven guilty and Juror Heaslip said that she would.

E.      Examination of Juror Loveless

THE COURT:   Miss Loveless, you put down – "what are your feelings regarding interracial relations" – you put down "unacceptable to me, but I do respect the others to pursue one if they choose."

JUROR LOVELESS:   Yes.

THE COURT:   The fact that you would not want to be involved in an interracial relationship, would that have anything to do on how you would decide on a verdict in this case?

JUROR LOVELESS:   No, your Honor, it would not.

THE COURT:   Okay. And – and we asked a question and we stated some of the facts of this case that the defendant, Mr. Holder, is a black man, and he's accused of having sex with a woman, who's Caucasian. And the People claim that he was HIV positive and didn't tell her. And they asked if you had an opinion based upon those facts alone.

Now, did you understand when I explained to you the "presumption of innocence?"

JUROR LOVELESS:   Yes, I did. Yes, I did, your Honor. Sorry.

THE COURT:   That's all right.  I'm sure after a couple of hours, we'll get it down!

Did you notice when the question was asked, it said the defendant was accused of this act, that you weren't to assume that this was true?

JUROR LOVELESS:   As I sat here yesterday, I specifically thought about that question and the wording, and wished that I'd had the opportunity to re-answer that because I think I was remiss in reading into the question –

THE COURT:   Okay.  But –

JUROR LOVELESS:    – in a way that may not be intended by the questions.

THE COURT:   Okay.  I think what you're probably telling me is you – you kind of read, glanced through it, and you missed the word "accused?"

JUROR LOVELESS:   Ya, I think I probably did.

THE COURT:   Okay.  The fact that a person is accused of a crime and now taking into consideration the presumption of innocence, if a person is accused of a crime, what is your opinion regarding his guilt or innocence, with that – those – that information alone?

JUROR LOVELESS:   He would be innocent until proven specifically in – in – in my opinion in the court as – as guilty.

The court instructed Juror Loveless to presume the defendant innocent until proven guilty and she said she would do so.

Each of the jurors stated under oath and on the record that they could set aside their opinions and decide the case on the evidence despite their views on interracial relationships.  Only Juror Flynn expressed unfavorable opinions about non-Caucasian men relative to the commission of crimes in society in her questionnaire, and ultimately she also stated that she could put those opinions aside in order to assist in rendering a fair decision in the case.  Defense counsel did not challenge any of these five jurors, and they later deliberated on the verdict.  The jury found petitioner guilty as charged.

Petitioner appealed his conviction as a matter of right to the Michigan Court of Appeals and raised three issues: (1) whether he received ineffective assistance of counsel

when his attorney failed to challenge biased jurors for cause and when counsel failed to object to the trial court's imposition of sentence because it exceeded the statutory guidelines; (2) whether the trial judge erred in failing to recuse himself when he sentenced petitioner on a separate charge in 1993 and warned petitioner at that time that if he got out of prison and committed another felony, he could face life imprisonment; and (3) whether the trial court erred in departing from the statutory sentencing guidelines when imposing sentence upon petitioner.

On the same day petitioner filed his brief in support of appeal on September 13, 2002, he also filed a motion to remand with the Michigan Court of Appeals relative to the ineffective assistance of counsel and sentencing issues. On October 25, 2002, the motion was denied. On November 14, 2002, the prosecutor filed her own motion to remand with respect to the issue of re-sentencing. The motion was granted and on remand, petitioner was re-sentenced to 7-1/2 to 15 years on February 5, 2003. A supplemental brief was filed by petitioner after remand with the Court of Appeals on April 30, 2003, with regard to another sentencing issue. However, on September 16, 2003, in an unpublished opinion, the Michigan Court of Appeals affirmed petitioner's conviction and sentence. *People v. Holder*, No. 238501, 2003 WL 22138282 (Mich.App. Sept. 16, 2003).

Petitioner filed a motion for reconsideration on September 30, 2003, which was denied on October 27, 2003. Appealing the Michigan Court of Appeals' decision affirming his conviction, petitioner filed an application for leave to appeal with the Michigan Supreme Court, which raised the same issues as those presented before the Court of Appeals. Petitioner's application was denied on April 9, 2004. *People v. Holder*, 469 Mich. 1036; 677 N.W.2d 328 (Table) (Mich. Apr. 9, 2004).

On August 23, 2004, petitioner filed an application for writ of habeas corpus in the United States District Court for the Eastern District of Michigan. The district court denied his petition for a writ of habeas under 28 U.S.C. § 2254. The district court subsequently denied petitioner's request for a certificate of appealability (COA). This court construed petitioner's notice of appeal as an application for a COA, pursuant to

Fed.R.App.P. 22(b). On January 18, 2008, this court granted petitioner's application for a COA on whether he received ineffective assistance of counsel when his attorney failed to challenge certain jurors for cause on the basis that they were biased.

## II.

This court reviews *de novo* the district court's legal conclusions in granting or denying a petition for a writ of habeas corpus. *Slaughter v. Parker,* 450 F.3d 224, 232 (6th Cir. 2006). This court usually reviews findings of fact for clear error, "but when the district court's decision in a habeas case is based on a transcript from the petitioner's state court trial, and the district court thus makes no credibility determination or other apparent findings of fact, the district court's factual findings are reviewed *de novo.*" *Wolfe v. Brigano,* 232 F.3d 499, 501 (6th Cir. 2000). And because petitioner filed his habeas petition in 2004, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) apply. *Barker v. Yukins*, 1999 F.3d 867, 871 (6th Cir. 1999) (AEDPA applies to petitions filed after April 24, 1996).

AEDPA prohibits this court from granting a state prisoner's habeas petition unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

A state court decision is "contrary to clearly established Federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a different result." *Slaughter,* 450 F.3d at 232. A state court decision unreasonably applies federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts." *Id.* (citing *Williams v. Taylor,* 529 U.S. 362, 407-08 (2000)).

A federal habeas court may not issue a writ under the unreasonable-application clause "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Bell v. Cone,* 535 U.S. 685, 694 (2002) (quoting *Williams,* 529 U.S. at 411).   The question under AEDPA is not "whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."  *Owens v. Guida,* 549 F.3d 399, 404 (6th Cir. 2008) (quoting *Schiro v. Landrigan,* 550 U.S. 465 (2007)).

Under AEDPA, the initial inquiry is whether petitioner seeks to apply a rule of law that was clearly established at the time of his conviction in the state court.  *See Williams,* 529 U.S. at 412.  Petitioner seeks to apply the Supreme Court's holding in *Strickland v. Washington,* 466 U.S. 668 (1984), which the Supreme Court had clearly established at the time of his conviction, to show ineffective assistance of counsel.  The Court in *Strickland* established a two-prong test to evaluate claims of ineffective assistance of counsel pursuant to the Sixth Amendment.  First, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  A court considering a claim of ineffective assistance of counsel "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.*   Second, the petitioner must show that counsel's performance prejudiced the petitioner.  That is, the petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*  When a biased juror is impaneled, however, "prejudice under *Strickland* is presumed, and a new trial is required." *Hughes v. United States,* 258 F.3d 453, 457 (6th Cir. 2001).

Petitioner argues that it was ineffective assistance of counsel for his trial counsel to fail to challenge the seating of the five jurors whose *voir dire* responses showed them to be biased against interracial relationships.  Pursuant to the Sixth and Fourteenth Amendments, a criminal defendant is guaranteed the right to an impartial and unbiased jury.  *Morgan v. Illinois*, 504 U.S. 719, 727 (1992).  "Among the most essential responsibilities of defense counsel is to protect his client's constitutional right to a fair and impartial jury by using *voir dire* to identify and ferret out jurors who are biased against the defense."  *Miller v. Francis,* 269 F.3d 609, 615 (6th Cir. 2001); *see also United States v. Blount,* 479 F.2d 650, 651 (6th Cir. 1973) ("The primary purpose of the *voir dire* of jurors is to make possible the empaneling of an impartial jury through questions that permit the intelligent exercise of challenges by counsel").

Counsel, however, is granted deference when conducting *voir dire*. *Hughes,* 258 F.3d at 457.  "An attorney's actions during *voir dire* are considered to be matters of trial strategy . . . .  A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Id.*  Despite this strong presumption that counsel's decisions are based on sound trial strategy, it is insufficient for counsel to simply articulate a reason for an omission or act alleged to constitute ineffective assistance of counsel.  "The trial strategy itself must be objectively reasonable." *Miller,* 269 F.3d at 616 (citing *Strickland*, 466 U.S. at 681).

A trial court's management of *voir dire* is granted similar deference.  The Supreme Court has acknowledged the "traditionally broad discretion accorded to the trial judge in conducting *voir dire*." *Mu'Min v. Virginia*, 500 U.S. 415, 423 (1991).  A trial court's management of *voir dire*, however, is "subject to essential demands of fairness." *Hughes*, 258 F.3d at 457.  Because a petitioner's Sixth Amendment right to an impartial jury is at stake, "a defendant may obtain a new trial if an impaneled juror's honest responses to questions on *voir dire* would have given rise to a valid challenge for cause." *Id.*  "Challenges for cause are subject to approval by the court and must be based on a finding of actual or implied bias." *Id.*

Pursuant to the Sixth Amendment, for a finding of juror impartiality when a juror is challenged for cause, the relevant question is "did the juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount,* 467 U.S. 1025, 1036 (1984). In *Patton*, the Supreme Court found that the trial court did not commit "manifest error" when finding jury members to be impartial. Eight of the fourteen jurors in question, due to pretrial publicity, "admitted that at some time [prior to trial] they had formed an opinion as to [defendant's] guilt." *Id.* at 1029-30. One of the impaneled jurors "stated at *voir dire* that he would have required evidence to change his mind about [defendant's] guilt." *Id.* at 1030-31.

A qualified juror need not be "totally ignorant of the facts and issues involved." *Murphy v. Florida,* 421 U.S. 794, 800 (1975). Rather, "it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* In *Murphy,* the Supreme Court found that defendant had "failed to show that . . . the jury-selection process of which he complains permits an inference of actual prejudice." *Id.* at 803. One juror agreed, on *voir dire*, with the characterization that "[m]y experience of [defendant] is such that right now I would find him guilty." *Id.* at 802. Another juror responded during *voir dire* that defendant's prior convictions would "probably" influence her verdict. A third juror conceded that "it would be difficult, during deliberations, to put out of [the juror's] mind that [defendant] was a convicted criminal." *Id.* at 805. Because juror impartiality is a factual determination, the state court's findings are entitled to a presumption of correctness. 28 U.S.C. § 2254; *see Wainwright v. Witt,* 469 U.S. 412, 428-29 (1985). A trial judge's finding of juror impartiality may only be overturned where manifest error is shown. *Patton,* 467 U.S. at 1031.

Because petitioner's claim for ineffective assistance of counsel is based on his trial counsel's failure to strike the allegedly biased jurors, petitioner must show that the jurors were actually biased against him. *Hughes,* 258 F.3d at 458. Holder must show through a review of *voir dire* testimony that a "fair trial was impossible." *Ritchie v.*

*Rogers,* 313 F.3d 948, 952 (6th Cir. 2002). "A juror's express doubt as to her own impartiality on *voir dire* does not necessarily entail a finding of actual bias. The Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality on *voir dire*." *Hughes*, 258 F.3d at 458; *see also Patton*, 467 U.S. at 1025. Bias in this context is "actual bias, or bias in fact: the existence of a state of mind that leads to an inference that the person will not act with impartiality." *Hughes*, 258 3d at 463.

In *Hughes*, the petitioner similarly claimed that his trial counsel was ineffective for failing to remove a biased juror. During *voir dire*, the judge asked the potential jurors whether they thought they could be fair. One of the jurors responded that she had a nephew and a couple of friends on the police force with whom she was quite close. *Id.* at 456. When the court asked the juror if those relationships would prevent her from being fair in the case, she responded, "I don't think I could be fair." *Id.* We held that, while a juror's express doubt as to her ability to be impartial on *voir dire* does not necessarily result in a finding of actual bias, actual bias was present in that case because neither counsel nor the trial court responded to the juror's express statement that she could not be fair. *Id.* at 458-59. Neither counsel nor the trial court asked follow-up questions directed toward rehabilitating the juror or obtaining assurances of impartiality. Because the only evidence relevant to the issue of bias was the juror's statement that she did not think she could be fair, we had no choice but to find actual bias. *Id.* at 460. We further concluded that counsel's failure to respond to the juror's express admission of bias on *voir dire* was objectively unreasonable under *Strickland*. *Id.* at 462.

This case presents facts far different from *Hughes*. Here, the trial court, as well as defense counsel, questioned the jurors regarding whether they could be both fair and impartial. Each of them stated under oath and on the record that they could set aside their opinions and decide the case on the evidence despite their views on interracial relationships. Unlike the juror in *Hughes*, the jurors here never stated that they could not be fair and impartial. What enabled this court in *Hughes* to presume partiality – a blatant statement of partiality and absolutely no contrary statement from the juror that she could

be impartial – is absent here. Each of the five jurors consistently answered that they could set their opinions aside and decide the case upon the evidence presented, presuming the defendant innocent.

In another case decided by this court, *Wolfe v. Brigano*, 232 F.3d 499 (6th Cir. 2000), the petitioner claimed that the trial court violated his Sixth Amendment right to an impartial jury when it refused to remove four biased jurors for cause. One juror "did not think he could be a fair and impartial juror." *Id.* The second juror stated it was "hard to say" whether her relationship with the victim's parents would impact her ability to deliberate fairly. *Id.* The third juror "expressed doubt as to whether she could put aside [news] reports and decide the case solely on the evidence presented at trial." *Id.* Finally, the fourth juror "doubted he would require the prosecution to prove its case beyond a reasonable doubt." *Id.* at 503. We found that the trial court erred in failing to excuse these four jurors for cause. *Id.* at 502. However, each of these jurors expressly doubted his or her ability to decide the case fairly.

Here, Holder provides no reason to doubt the validity of the jurors' assurances. Nor is there any reason to believe that the jurors' opinions about interracial relationships were so strong as to undermine the reliability of their assurances that they could put their opinions aside and evaluate the case fairly and impartially. In assessing whether a juror was actually biased against a defendant, this court considers the totality of the juror's statements. *See Miller,* 269 F.3d at 618 (considering all the statements made by the juror during *voir dire*). Here, the totality of the jurors' statements during *voir dire* demonstrate that the jurors unequivocally stated that they would consider Holder innocent until proven guilty, that they would set aside any personal opinions, and decide the case only on the evidence submitted. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. 717, 723 (1961). The question of juror impartiality is largely one of

credibility, and thus, the trial court's determination is entitled to "special deference." *Patton*, 467 U.S. at 1038. The "ultimate question is whether the juror swore that he could set aside any opinion he might hold and decide the case on the evidence." That is what occurred here. Although the five jurors at issue initially expressed bias against interracial relationships, upon further questioning, each one unequivocally stated that he or she could set aside any previously formed opinion and decide the question of Holder's guilt based on the evidence presented in court. In light of the special deference given to a trial judge's determination of juror impartiality as well as the deferential standard for reviewing factual findings under § 2254, we cannot say that the Michigan court's ruling on this issue was unreasonable.

The dissent emphasizes that the Michigan Court of appeals, when analyzing this claim, cited a Michigan case for the contention that defense counsel's failure to challenge a juror may not form the basis of an ineffective assistance of counsel claim. As the dissent notes, this contention is not consistent with the *Strickland* standard. But this mistaken analysis of *Strickland*'s performance prong does not move the state court's decision out from under AEDPA, as the dissent claims. The fact remains that the state court applied the *Strickland* standard to Holder's claim and addressed that claim on the merits. By doing so, that court's decision is entitled to deference under AEDPA. *See* 28 U.S.C. § 2254(d) (explaining that "any claim that was adjudicated on the merits in State court proceedings" is subject to AEDPA deference).

The law requires such deference to be given even in cases, such as this one, where the state court's reasoning is flawed or abbreviated. *See Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) ("[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence."); *Hurtado v. Tucker*, 245 F.3d 7, 20 (1st Cir. 2001) ("The ultimate question is not how well reasoned the state court decision is, but whether the outcome is reasonable . . . . [E]ven a poorly reasoned state opinion does not mean that the outcome represents an unreasonable application."); *Hemmon v. Cooper*, 109 F.3d 330, 334-35

(7th Cir. 1997) ("'It doesn't follow that the criterion of a reasonable determination is whether it is well reasoned. It is not. It is whether the determination is at least minimally consistent with the facts and circumstances of the case."); *see also Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000) (giving AEDPA deference to a Michigan Court of Appeals's "summary denial" of a claim despite the lack of any reasoning).

Both the Supreme Court and this court, moreover, have found no actual bias where the evidence of bias was much stronger than the five jurors' expressed disapproval of interracial relationships. *See Patton,* 467 U.S. at 1029 (holding that the trial court did not commit manifest error by finding the jurors to be impartial, even though eight jurors admitted that, due to pretrial publicity, at some time prior to trial, they had formed an opinion as to defendant's guilt); *see also United States v. Pennell*, 737 F.2d 521, 529 (6th Cir. 1984) (holding that there was inadequate evidence of actual bias where five jurors received threatening, late-night phone calls telling them to find the defendant guilty, and one juror stated that the phone calls might influence her judgment in the case). If the evidence in *Patton* and *Pennell* was not adequate to establish actual bias, then the five jurors' comments about interracial relationships were certainly not sufficient to establish bias in the instant case.

Holder has presented no evidence that the five jurors were actually biased, nor that they were untruthful when each juror stated that he or she could be impartial and decide the case on the facts. Therefore, the court finds that Holder has failed to demonstrate either that his trial counsel's failure to challenge the five jurors "permeated the entire trial with obvious unfairness," *Hughes,* 258 F.3d at 457, or that the trial court committed plain error by allowing the five jurors to serve on the jury. No "actual bias" or "bias in fact" has been shown on the record in accordance with applicable United States Supreme Court and federal law. Although defense counsel's decision to leave the five jurors on the panel might have been ill-advised, criminal defense lawyers should be given broad discretion in making decisions during *voir dire*. "Few decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire*, where decisions are often made on the basis of intangible factors." *Miller*, 269 F.3d at 620. Holder's

challenge to the state court's decision under the *Strickland* test does not reach the high threshold established by AEDPA for the granting of habeas relief.  Therefore, the Michigan Court of Appeals' decision to affirm Holder's conviction was neither contrary to nor an unreasonable application of federal law.

## III.

For the foregoing reasons, we **AFFIRM** the district court's judgment and **DENY** the Writ.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  Because I believe that at least three of the impaneled jurors showed actual bias and that their assurances of impartiality should not have been believed, I would hold that Holder's trial counsel's failure to challenge the seating of these jurors constituted ineffective assistance of counsel and that Holder is entitled to a writ of habeas corpus.  In my view, the Michigan Court of Appeals applied a decisional rule that was contrary to clearly established Supreme Court precedent as set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and this court should therefore review the merits of Holder's claim de novo.  However, even if the deferential standard of review provided by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d)(1), did apply in this case, I believe that the Michigan Court of Appeals unreasonably applied clearly established Supreme Court precedent when it held that trial counsel's failure to challenge the seating of these jurors was not objectively unreasonable.

## I. STANDARD OF REVIEW

Because this case is governed by AEDPA, this court may not grant a writ of habeas corpus on a claim adjudicated on the merits in state court unless the adjudication:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  A state-court decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362,

412-13 (2000). And "[a] state court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court *applies a rule* that contradicts the governing law set forth in [Supreme Court] cases." *Id.* at 405 (emphasis added). For example, a state-court decision would be contrary to clearly established federal law "if, in spite of the rule in [*Strickland*]—that a petitioner urging ineffective assistance of counsel need only show a 'reasonable probability' of prejudice—a state court required the petitioner to show prejudice by a preponderance of the evidence." *Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006) (quoting *Williams*, 529 U.S. at 405-06). When a state court applies a decisional rule that is contrary to Supreme Court precedent, the deferential standard of review of § 2254(d)(1) does not apply and de novo review is appropriate. *See Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006) (Gilman, J.) ("When the state court issues a decision that is contrary to federal law, we review the merits of the petitioner's claim de novo."); *Fulcher*, 444 F.3d at 799 (same); *Magana v. Hofbauer*, 263 F.3d 542, 551 (6th Cir. 2001) (same).

In rejecting Holder's ineffective-assistance claim, the Michigan Court of Appeals applied a decisional rule that was contrary to *Strickland*. Although the Michigan Court of Appeals applied a state-law standard that was generally similar to *Strickland*, it found in the Michigan case law an exception that required it to reject Holder's claim. The court stated that "defense counsel's failure to challenge a juror may not form the basis for a claim of ineffective assistance of counsel." Joint Appendix ("J.A.") at 24 (Mich. Ct. App. Op. at 2) (citing *People v. Robinson*, 397 N.W. 2d 229, 231 (Mich. Ct. App. 1986)). *Strickland* contemplates no such exception, nor has one been recognized in subsequent decisions of the Supreme Court. Moreover, this court has applied *Strickland* to grant relief based upon counsel's failure to challenge a biased juror. *See, e.g.*, *Miller v. Webb*, 385 F.3d 666, 678 (6th Cir. 2004); *Hughes v. United States*, 258 F.3d 453, 464 (6th Cir. 2001).

The Supreme Court has made clear that state-court decisions that alter or add additional requirements to *Strickland* should be rejected as contrary to federal law. In *Williams*, the Court concluded that the Virginia Supreme Court applied a standard that

was contrary to *Strickland* when it required the prisoner to show not only deficient performance and prejudice, but also that "the result of the proceeding was fundamentally unfair or unreliable." 529 U.S. at 394 (internal quotation marks omitted). The Court also indicated that it would be contrary to clearly established Supreme Court precedent if a state court were to require a prisoner to demonstrate prejudice by a preponderance of the evidence, because *Strickland* held that a "prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'" *Id.* at 406 (quoting *Strickland*, 466 U.S. at 694).

Because it is contrary to *Strickland* for a state court to require a prisoner to make an additional showing not required by *Strickland* or to meet a higher burden of proof than required by *Strickland*, it follows that it is contrary to *Strickland* for a state court to exclude categorically an entire class of ineffective-assistance claims from *Strickland*'s rule. Here, the Michigan Court of Appeals purported to exclude from *Strickland*'s rule any ineffective-assistance claim that is based upon counsel's failure to challenge a juror. Because the decision of the Michigan Court of Appeals was contrary to clearly established Supreme Court precedent, this court should review the merits of Holder's claim de novo.[1]

---

[1]In responding to my argument for de novo review, the majority cites *Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000), and three nonbinding cases from other circuits for the proposition that a federal habeas court should review the state court's conclusion and not its reasoning. Maj. Op. at 17–18. *Harris* embraced an approach that came to be known as "modified AEDPA deference," under which this court will conduct an independent review of the applicable facts and law but grant the writ only if the state court's ultimate decision was contrary to or an unreasonable application of federal law. *See Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005). Modified AEDPA deference applies only in cases where there is little or no reasoning to review. *See Harris*, 212 F.3d at 943 (evaluating a state court's denial of relief "when there is no state court decision articulating its reasons"). Extending that approach to cases in which the state court has explained its reasoning would be in tension with Supreme Court precedent. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls [of being 'contrary to' clearly established Supreme Court precedents] does not require citation of our cases—indeed, it does not even require *awareness* of our cases, so long as *neither the reasoning nor the result* of the state-court decision contradicts them.") (second emphasis added); *see also Cornwell v. Bradshaw*, 559 F.3d 398, 405 (6th Cir. 2009) ("A state court decision on the merits is contrary to clearly established Supreme Court precedent only if the reasoning or the result of the decision contradicts that precedent."). Indeed, as noted above, this court has acknowledged the Supreme Court's instruction that a state-court decision is "contrary to" clearly established federal law "if the state court *applies a rule* that contradicts the governing law set forth in [Supreme Court] cases." *Fulcher*, 444 F.3d at 799 (quoting *Williams*, 529 U.S. at 405) (emphasis added). I believe that *People v. Robinson* contradicts *Strickland*. Accordingly, I would conclude that in applying *Robinson*, the state court rendered a decision contrary to clearly established Supreme Court law.

## II.  INEFFECTIVE ASSISTANCE OF COUNSEL

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  In determining whether a juror was impartial, we must ask two questions: "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, *and* should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (emphasis added).  Both questions are important. Not only must the juror give an affirmative promise of impartiality, but also that promise must be believable in light of what the juror has revealed and the context of the case. *See Miller*, 385 F.3d at 677 n.2 ("An affirmative statement of impartiality is required to ensure that a juror is unbiased, but such a statement alone is not the determining factor. A trial court must still determine, from the context, whether such a statement is believable."); *Wolfe v. Brigano*, 232 F.3d 499, 502 (6th Cir. 2000) ("A court's refusal to excuse a juror will not be upheld 'simply because the court ultimately elicits from the prospective juror a promise that he will be fair and impartial . . . .'" (quoting *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 156 (3d Cir. 1995)).

In my view, the assurances of impartiality given by jurors Flynn, Coppinger, and Moore are simply not credible given the racial biases revealed by these jurors and the underlying facts of this case.  First, Juror Flynn revealed that she held negative stereotypes about black persons' purported propensities toward criminality and violence and that she sometimes looked down upon people of other races.  Flynn stated that she believed that black men were more likely than men of other races to act upon feelings of hate or revenge by resorting to violence and that more crimes were committed by non-Caucasians than by Caucasians.  Flynn also disclosed that, because her father once had been robbed by a Hispanic man, she sometimes viewed "other races" as "below [her] standards."  J.A. at 381 (R. 14-2 at 9).  Although Flynn assured the judge during *voire dire* that she would decide the case on the evidence and would not take Holder's race into account, Flynn never backed away from her earlier statements or acknowledged that there was any hint of racial prejudice in her views.

In my view, Flynn's disclosures revealed actual racial bias that required her removal from the jury pool. *See Rosales-Lopez v. United States*, 451 U.S. 182, 191 (1981) (warning that "'[n]o surer way could be devised to bring the processes of justice into disrepute'" than "'to permit it to be thought that persons entertaining a disqualifying [racial] prejudice were allowed to serve as jurors'" (quoting *Aldridge v. United States*, 283 U.S. 308, 314-15 (1931)). Flynn revealed that she not only harbored negative stereotypes about criminality and violence among African-American men, but also sometimes viewed "other races" as "below [her] standards." J.A. at 381 (R. 14-2 at 9). Flynn never retracted these stereotypical views. This was a racially charged criminal prosecution of a black male on charges of sexual misconduct against a white female victim with whom he had a relationship. Under these circumstances, Flynn's subsequent assurances of impartiality were simply not credible. Even if Flynn honestly believed that she could be fair, the racial stereotypes that she harbored created an unacceptable risk that she would draw unreliable inferences about Holder's conduct and that she would be unable to fairly weigh the evidence. *See* ANTONY PAGE, *Batson's Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 B.U. L. REV. 155, 160 (2005) ("Once stereotypes have formed, they affect us even when we are aware of them and reject them. Stereotypes can greatly influence the way we perceive, store, use, and remember information. Discrimination, understood as biased decision-making, then flows from the resulting distorted or unobjective information." (footnote omitted)).

Jurors Coppinger and Moore also revealed negative racial views, both jurors expressing a distaste for interracial relationships. Coppinger told the court that interracial relationships did not meet the "standard" she had set for herself and her two daughters. J.A. at 383 (R. 14-2 at 11). The court then presented Coppinger with a stark hypothetical situation in which two suitors pursued her daughter—one a black man who was successful, personable, "makes a nice income, and thinks the world of your daughter," and the other a white man with "long, greasy hair, earrings in his nose and his tongue and his ears, and tattoos all over his body." J.A. at 378 (R. 14-2 at 12). When asked which suitor she would prefer, Coppinger admitted that it "wouldn't be easy" to decide. J.A. at 379 (R. 14-2 at 13). Coppinger further acknowledged that she would

prefer to "not try that scenario." *Id.* Juror Moore also revealed an aversion to interracial relationships, stating that interracial couples should not have children because those children would be "a mixed breed" and would not know "what breed they really are!" J.A. at 397 (R. 14-2 at 18). When asked why she held this view, Moore explained, "I don't know why, but it's somethin' I guess I was brought up with." J.A. at 398 (R. 14-2 at 19).

I believe that these jurors' express aversion to interracial relationships created an unacceptable risk of actual bias. At the heart of this case was an interracial relationship between Holder and his white partner, Monica Kosecki, and the question of whether Holder informed Kosecki that he had HIV before the two had consensual sex. Jurors Coppinger and Moore made it clear that they found such interracial relationships to be unacceptable—at least for themselves and their families. Although both jurors told the court that they *thought* they could be fair and impartial, their tentative promises are untenable in light of their clear distaste for interracial relationships. Given the underlying facts of this case, Holder should not have been tried by a juror who considers interracial relationships to be beneath her "standard" or by a juror who believes that interracial couples should not have children because they result in "mixed breed" children. Accordingly, I believe that both Coppinger and Moore had actual bias and that their promises of impartiality should not have been believed.

### III. CONCLUSION

Because a decision to allow biased jurors to be impaneled "cannot be a discretionary or strategic decision," and because "there is no sound trial strategy that could support what is essentially a waiver of a defendant's basic Sixth Amendment right to trial by an impartial jury," *Miller*, 385 F.3d at 675-76, I believe it is clear that Holder's trial counsel's performance "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688. Further, because jurors with actual bias were impaneled, the prejudice prong of *Strickland* is also satisfied. *See Hughes*, 258 F.3d at 463 ("The seating of a biased juror who should have been dismissed for cause requires reversal of the conviction."); *Strickland*, 466 U.S. at 694. As explained above,

I believe that de novo review is appropriate in this case. However, even applying AEDPA's deferential standard, I believe that the Michigan Court of Appeals unreasonably applied clearly established Supreme Court precedent when it held that Holder had not shown that his counsel's performance was objectively unreasonable. For these reasons, I would grant Holder's petition.