IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2022

**RANDY CHAMPION v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 15-05137     Paula L. Skahan,  Judge**

_____

**No. W2021-00767-CCA-R3-PC**
_____

Petitioner, Randy Champion, appeals as of right from the Shelby County Criminal Court's denial of his petition for post-conviction relief, wherein he challenged his convictions for especially aggravated robbery, attempted second degree murder, employing a firearm during the commission of a dangerous felony, attempted aggravated robbery, and attempted especially aggravated robbery.  On appeal, Petitioner asserts that he received ineffective assistance of trial counsel because counsel (1) failed to use a peremptory challenge to remove a prospective juror who was an active Tipton County prosecutor and (2) failed to object to the State's inconsistent theories, thereby waiving this court's plenary review of the issue on direct appeal.  Following our review, we affirm.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

J. Shae Atkinson, Memphis, Tennessee, for the appellant, Randy Champion.

Herbert H. Slatery III, Attorney General and Reporter; Lindsay Haynes Cisco, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

Petitioner was convicted by a Shelby County jury of two counts each of attempted second degree murder and employing a firearm during the commission of a dangerous felony and one count each of especially aggravated robbery, attempted aggravated robbery, and attempted especially aggravated robbery.  *State v. Randy Champion*, No. W2018-

01393-CCA-R3-CD, 2019 WL 4127395, at *1 (Tenn. Crim. App. Aug. 29, 2019). Petitioner received an effective sentence of twenty-four years.

On direct appeal, this court summarized the proof presented at trial as follows:

Rogelio Rodriguez sat on the front porch of his home on the night of September 5, 2014, on Gerald Avenue in Shelby County, Tennessee, with his brother, Rolando Rodriquez. At around 7:00 p.m., his other brother Ramiro Rodriguez arrived and joined his brothers, talking about work. As the men talked, two "[t]hin [men with] black skin" approached, and one of the men fired a gun. The man with the gun pointed the gun at Rogelio while trying to take a wallet from Rolando. The man fired his gun again, this time at Rogelio. Rogelio was transported to the hospital where he underwent surgery for a gunshot wound to his stomach and remained in the hospital for a week. At the time of these events, Rogelio had a cell phone lying next to where he was seated on the porch. After the incident, the phone was no longer on the porch.

Rolando and Ramiro both lived with their brother Rogelio and his family on Gerald Avenue in September 2014. On the night of September 5, Rolando also heard a gunshot and then saw a person approaching him. The man, who was armed, attempted to take Rolando's wallet. Rolando was fearful of the man. As the man tried to take Rolando's wallet, he fired a second and third shot, one of which struck Rogelio. The other man had a knife and used it to cut Ramiro.

Ramiro described the events of the night similarly to his brothers. He added that while the man brandishing the gun attempted to take Rolando's wallet, the other man, who was holding a knife, asked Ramiro for his wallet. Ramiro complied and gave the man his wallet; however, the man still "stuck [him] with [the] knife." The man continued stabbing at Ramiro, so Ramiro ran around a truck parked in the driveway with the man in pursuit. As Ramiro fled from the man with the knife, he observed another man, shorter and heavier than the first two, standing in the neighbor's yard waiting for the two men who had approached him and his brothers. He also heard additional gunfire and then observed the two men fleeing. Ramiro realized that the man who held the gun had run out of ammunition, so he began to chase him in an attempt to detain him for the police. When he neared the men, they told him to leave; however, Ramiro asked the men to return his immigration paperwork from his wallet to him.

-2-

Ramiro recalled that the three men, who wore dark clothing, stood in front of him, and the man with the gun passed it to the man who had held the knife. The man, who initially had the knife but now held the gun, loaded the gun and then fired it. Ramiro fled.

Rosalinda Torres, Rogelio's wife, was also at the Gerald Avenue residence on September 5, 2014, with her three daughters, ages thirteen, nine, and seven. She recalled that her husband and his two brothers were outside in front of the house. Shortly after she and her daughters had come inside the house from outside, she heard a gunshot. She gathered the girls in the back room and then went to look out a window facing the front of the house. As she looked out the window she saw a tall, thin, black man pointing a gun at Rogelio. She returned to the room where she had gathered her daughters and called 911 with no one answering the call. She returned to the window and saw her brother-in-law helping Rogelio, who was injured. Ms. Torres went outside and stayed with Rogelio until the ambulance arrived. Ms. Torres confirmed that Rogelio's cell phone had been sitting next to him on the porch but was gone when she returned to the porch after Rogelio was shot. The phone was never returned to Rogelio.

Philip Perez, a Memphis Police Department ("MPD") officer, reported to the crime scene and found two injured men: one had been shot and the other stabbed. Ramiro showed the officer the direction he had chased the suspects. The suspects had run toward a drainage ditch with a fence around it. When Officer Perez approached the drainage ditch he found clothing outside of the fence. He learned from other sources that the three individuals had jumped over the fence and into the ditch, leaving behind the clothing found outside of the fence.

James Smith, an MPD crime scene investigator, photographed the scene. He found a projectile/bullet at the scene. He also reported to Weymouth Cove, where a pinstripe baseball cap with a Batman logo, a black T-shirt, and a black and green baseball cap with the word "Dub" were found.

Cervinia Braswell, a Tennessee Bureau of Investigation special agent, testified as an expert witness in the field of ballistic and firearm identification. She identified the bullet/projectile recovered at the crime scene as a .38 caliber bullet, "consistent with [a] .38 Special or .357 magnum bullet," noting that a .38 Special bullet can be fired from either a .38 Special revolver or a .357 revolver.

The State informed the trial court that co-defendant [Anthony] Bracey, acting pro se, wanted to recall Ramiro. During this discussion, co-defendant Bracey informed the trial court that he no longer wanted to proceed pro se but that he wanted representation. The trial court asked "elbow counsel" if he was ready to proceed as counsel, and "elbow counsel" indicated that he would need a continuance. The trial court declared a mistrial as to co[-]defendant Bracey. [Petitioner's] attorney then asked for a severance, and the trial court granted "an automatic severance." [Petitioner's] attorney conveyed to the trial court [Petitioner's] "wishes to go forward." The trial court informed the jury of the change as follows:

> While you were out we had some legal issues going on and [co-defendant] Bracey changed his mind and decided he wanted his elbow counsel to represent him. So his attorney now needs more time to prepare to represent [co-defendant] Bracey. So I have severed them out of this trial. And we're going to proceed with [Petitioner's] case only.

Austin Yewell testified that he was "long time friends" with [Petitioner] and Marterius O'Neal. Mr. Yewell also knew co-defendant Bracey. Mr. Yewell confirmed that he had owned a .38 caliber revolver and that the last time he had seen the gun was when he gave it to [Petitioner] in September 2014. Mr. Yewell gave [Petitioner] the revolver "[t]o rob people," specifically Hispanic people. Mr. Yewell would loan [Petitioner] his revolver and receive a portion of the proceeds in return.

Jesus Perea, an MPD officer, was assigned to a task force that investigated a "rash" of robberies targeted at Hispanics. Officer Perea took statements from the three victims involved in this case. During the course of the investigation, Officer Perea also spoke with Marterius O'Neal, Austin Yewell, and Anthony Bracey. As a result of information he learned during these interviews, Officer Perea began reviewing Facebook accounts and observed many photographs of [Petitioner] wearing bandannas and one of him wearing a Batman hat that looked like the one recovered in this case. Consequently, he spoke with [Petitioner] about these crimes. Officer Perea identified [Petitioner's] statement. The statement reads in part:

> We was [sic] at the house and [sh**] and my brother talked to this girl named Boo. I don't know her real name. Anthony Bracey wanted me to walk to her house with him. Me, my brother, and Marterius O'Neal started walking over

-4-

there. We got half way over there and me and Marterius seen the Mexicans. We decided to rob them so we told my brother that we was fina [sic] rob them and he said go ahead im a [sic] keep going to my girl house. We walked around the block like 3 times. The third time we decided to gone head do it [sic]. I saw 2 Mexicans on the porch and one Mexican on the truck. Me and Marterius ran up on them. I fired one shot in the air and one of the Mexicans moved. I had two Mexicans in front of me and Marterius had the other one in front of him. I told them not to move and I fired one more shot. After that I got one Mexican out the chair and put him on the ground. I looked up and I saw Marterius running after the other one. So I was left with the 2 Mexicans on the porch. I had my hand in the one guys pocket to get his wallet and the other guy got up and charged me. We started tussling for a minute and the gun had went off. I took off running towards the street. Then I started walking with O'[N]eal and he tapped me on the shoulder and told me to run, so I did. I seen a Mexican chasing us. At this point we caught up to where my brother was. The Mexican caught up with us and wanted his ID. Marterius told him we dropped his ID. The Hispanic guy still followed us. My brother was like what the [f***], and told him they told you they dropped your ID, main damn. My brother walked towards and the Hispanic guy backed up. My brother turned around and we all started running. We ran towards the ditch and I dropped my hat. We ran in the ditch and we called up Ced and he picked us up. We drove to McDonalds on Jackson Ave.

[Petitioner] also admitted to dropping an "all-black hat with a yellow Batman Symbol" as they fled the crime scene. [Petitioner] identified Austin Yewell as the owner of the gun. He denied taking anything from the victims but indicated that Marterius O'Neal had taken something.

Officer Perea identified two photographic line-ups. A photograph of Marterius O'Neal was circled on both line-ups and identified as the person with the knife. He identified another photographic line-up that had a photograph of Anthony Bracey. Handwritten on the document was, "this is the person that shot at me and pointed a pistol at me." Officer Perea confirmed that the victims were never shown a photographic lineup of [Petitioner]. Having spoken with all three men, Officer Perea said he would

describe Marterius O'Neal and [Petitioner] as "slender" and Anthony Bracey as "thicker."

*Id.* at *1-3 (footnote omitted).

Relevant to the issues in this appeal, on direct appeal, Petitioner contended that the trial court erred by allowing the State to present inconsistent theories at trial, arguing that an "alternative theory of the case" was created by the differences between the witness testimony and Petitioner's police statement. *Id.* at *7. This court concluded that because Petitioner never objected to the presentation of the State's evidence at trial, the issue had been waived. *Id.* This court affirmed Petitioner's convictions, and Petitioner did not seek further review. *Id.* at *1.

Thereafter, Petitioner filed a pro se petition for post-conviction relief, raising multiple constitutional issues. After post-conviction counsel was appointed, Petitioner filed an amended petition arguing, in relevant part, that he received ineffective assistance of counsel because counsel failed to strike a prosecutor from the jury panel and because counsel failed to object to the State's inconsistent theories at trial, resulting in that issue's waiver on direct appeal.

At the post-conviction hearing, trial counsel testified that, during his representation of Petitioner, he visited Petitioner in jail at the beginning of the case, before each court date, when counsel needed to share important information, and in the time leading up to trial. Counsel provided Petitioner with a copy of the discovery materials and discussed them with Petitioner during their visits. Counsel said that he discussed the general facts of the case with Petitioner and that Petitioner denied being present and told counsel "a number of different scenarios."

Trial counsel testified that Petitioner had at least four separate indictments related to an ongoing scheme in which Mr. O'Neal[1] and co-defendant Bracey would borrow Mr. Yewell's gun and look for Hispanic people to rob on Friday, which was customarily payday. Counsel stated that co-defendant Bracey was Petitioner's brother.

Trial counsel testified that the only pretrial plea offer from the State was to enter an open guilty plea. Counsel explained that he also represented Petitioner in a first degree murder case that was tried before this case, in which Petitioner received a "sweetheart verdict," which counsel later specified was reckless homicide. Counsel opined that, after

---

[1] The record reflects that Mr. O'Neal was also named in Petitioner's indictments. Petitioner filed a pretrial motion to sever his case from that of his co-defendants; however, the trial court denied that motion. From the record, it is unclear why Mr. O'Neal was not tried with Petitioner and co-defendant Bracey.

that verdict, the prosecutor was "bound and determined" to obtain convictions in this case reflecting the seriousness of Petitioner's crimes.

Trial counsel testified that, after jury selection, he advised Petitioner to enter an open guilty plea, but Petitioner declined. After co-defendant Bracey requested counsel and was severed from Petitioner's trial, trial counsel conferred with the prosecutor and obtained a plea offer for fifteen years at eighty-five percent service in exchange for Petitioner's testimony against co-defendant Bracey. Petitioner declined the offer.

Relative to jury selection, trial counsel testified that juror Sean[2] Hord was an Assistant District Attorney General in Tipton County. Counsel stated that, at the time Mr. Hord was "seated in the box," counsel had used eight or nine peremptory challenges and wanted to preserve his remaining challenges. Counsel informed co-defendant Bracey of Mr. Hord's occupation and urged him to use a peremptory challenge, but co-defendant Bracey declined and said that he liked Mr. Hord. Counsel said that he hoped the State would strike on one or two people on that panel, leading to the parties' considering a new group of jurors, and that counsel could "back strike" Mr. Hord if necessary. Counsel stated, though, that neither he, co-defendant Bracey, nor the prosecutor struck any of the jurors, resulting in Mr. Hord's serving on the jury. Counsel stated that he called a mentor attorney that evening and met with three additional mentor attorneys the following morning about the situation. Counsel spoke with Petitioner before court began and urged him to enter an open guilty plea; however, Petitioner wished to proceed with trial.

Trial counsel testified that the initial defense strategy was for Petitioner to testify that co-defendant Bracey threatened him and forced him to lie to the police about being present during the robbery. Counsel noted that, in cases with strong evidence against a defendant, it was sometimes necessary to wait for the State or a witness to make a mistake at trial. Counsel stated that Petitioner's previous murder case had been tried in a different court division due to severance issues and that, as a result, the prosecutor was unfamiliar with Petitioner's history and pending cases. Counsel had advised Petitioner to testify in that case because a lower risk existed that the prosecutor would impeach him with the facts underlying the pending cases. Counsel noted that he and Petitioner spoke at length about whether he would testify in the present case because the trial prosecutor knew about all of the pending charges.

Trial counsel agreed that the victims never identified Petitioner as one of the men on the porch; however, Petitioner told the police that he was on the porch. When asked why he did not contemporaneously object to this inconsistent information, counsel

---

[2] The appellate record refers to "Shawn Hord" or "Shawn Horde." We note that the correct spelling, as reflected in Petitioner's brief, is Sean Hord.

responded that he did not recall his reasoning. Counsel reiterated his strategy of waiting for the State to make a mistake, and he noted that during trial was the first time the witnesses disclosed that the third person was located two or three houses down the street. Counsel stated that the third person was described as wearing a baseball cap, which was later found near a drainage ditch and linked to Petitioner using a Facebook photograph. Counsel said that, after this information came out, the defense theory became "sort of a renunciation" in which Petitioner had abandoned the robbery plan and stood down the street from the porch on which the robbery occurred. Counsel stated that he performed research in preparation for the motion for new trial and "came up with" the inconsistent theories issue then.

On cross-examination, trial counsel agreed that the State's theory at trial was one of criminal responsibility and that Petitioner's detailed statement included that he was one of the men on the porch. Counsel did not recall whether the victims described the individual down the street from the porch as being heavier-set than the two men on the porch. Counsel stated that co-defendant Bracey was heavier-set than Petitioner and Mr. O'Neal. Counsel affirmed that Mr. O'Neal's police statement implicated himself and Petitioner and that Mr. Yewell's police statement indicated that he provided the gun to Mr. O'Neal and Petitioner. Counsel agreed that, if Petitioner had testified and denied knowledge of the robbery plan, it could have opened the door to evidence of Petitioner's additional crimes and the co-defendants' "enterprise" to rob Hispanic people.

Trial counsel testified that, as a result of Petitioner's reckless homicide verdict, which counsel attributed to "juror error," Petitioner's expectations were "exceedingly high" in this case. Relative to jury selection, counsel agreed that he made a strategic decision to reserve his remaining peremptory challenges and that he thought he could back strike Mr. Hord if needed. Counsel added that he knew Mr. Hord had previously worked as a criminal defense attorney and that, after jury selection, counsel hoped that the jury would understand and properly apply the "beyond a reasonable doubt" legal standard. Counsel agreed that Mr. Hord's occupation was "no more disqualifying than the fact that he had been a . . . defense attorney" and that Mr. Hord was not employed by the Shelby County District Attorney's Office.

Trial counsel testified that, in Petitioner's previous murder case, he sat first chair. Counsel stated that, at the time of Petitioner's trial in this case, he was qualified to try death penalty cases and had previously tried death penalty and first degree murder cases. Counsel said that, relative to the inconsistencies between Petitioner's statement and the witness testimony, he would have objected if he thought grounds for an objection existed or if an issue needed to be preserved for appeal. Counsel stated that he had previously handled criminal appeals and that he was familiar with preserving issues for the record.

Petitioner testified that trial counsel came to see him "a lot of times" for visits that lasted about fifteen to twenty minutes each. Petitioner stated that counsel provided him with a discovery packet and reviewed everything aside from the victims' statements. Petitioner averred that he told counsel that, on the night of the robberies, he was at his mother's house with her and her boyfriend. Petitioner did not recall his mother's speaking to trial counsel, but he also did not recall whether he asked counsel to contact her.

Petitioner testified that trial counsel thought it was in Petitioner's best interest to enter an open guilty plea and "ask the [c]ourt to have mercy on [him]." Petitioner decided to proceed to trial. He recalled the fifteen-year plea offer made during trial; although counsel told Petitioner that the offer would allow him an opportunity to see his family again, Petitioner rejected it. Petitioner stated that, after co-defendant Bracey's mistrial, counsel asked if he wanted to proceed and that he answered affirmatively.

Relative to jury selection, Petitioner testified that he did not know Mr. Hord was a prosecutor until trial counsel brought it to his attention after the jury was empaneled. Petitioner stated that, the following day, he decided to go forward with the trial.

On cross-examination, Petitioner testified that trial counsel informed him of the risks of testifying and the prosecutor's greater familiarity with all of his pending cases than the prosecutor in the murder case. Petitioner stated that, after two or three conversations about his potential testimony and counsel's advice not to testify, he elected not to testify. Petitioner acknowledged that he and Mr. O'Neal implicated one another in their police statements as the two men on the porch. He agreed that the statements were "a pretty big hurdle to overcome at trial," and he noted that counsel told him that the "inconsistent statements [were] the reason why he didn't really want [Petitioner] to testify because [counsel] had a good strategy." Petitioner stated that the victims only identified co-defendant Bracey and Mr. O'Neal as the perpetrators. When asked whether counsel's strategy included using inconsistencies to discredit Petitioner's police statement, Petitioner responded negatively; however, he later agreed that he and counsel discussed such a strategy. He said that counsel was only concerned about the jury's potentially hearing about Petitioner's other cases.

The post-conviction court entered a written order denying relief. Relative to Mr. Hord, the court found that trial counsel had used most of his peremptory challenges and that counsel assumed that the parties would be presented with another group of prospective jurors. The court noted that counsel told co-defendant Bracey to use a peremptory challenge to strike Mr. Hord and found that counsel made a "conscious decision" to use a back strike if needed. The court also found that counsel spoke with several mentor attorneys after voir dire, discussed the situation with Petitioner, and advised him to enter an open guilty plea. The court determined that Petitioner had presented no evidence that

-9-

counsel's decision not to strike Mr. Hord was uninformed and based upon inadequate preparation. The court found that counsel had testified about his "entire strategy" during voir dire, that Mr. Hord was not employed by the Shelby County District Attorney's Office, and that no evidence indicated that Mr. Hord "had any standing in the result of the trial."

Relative to the State's inconsistent theories, the post-conviction court recounted trial counsel's testimony that an inconsistency argument could have been used as an attempt to invalidate Petitioner's police statement. The court found, however, that Petitioner had presented no evidence that an inconsistency argument would have significantly affected the outcome of the trial. The court concluded, "With no certainty that the argument would have been enough to suppress Petitioner's statement and the possibility for Petitioner's previous, similar offenses to be introduced at trial, there is not sufficient evidence presented in order to grant Petitioner relief on this claim." Petitioner timely appealed.

## **Analysis**

On appeal, Petitioner asserts that he received ineffective assistance of trial counsel because counsel (1) failed to use a peremptory challenge to remove a prospective juror who was an active Tipton County prosecutor and (2) failed to object to the State's inconsistent theories, thereby waiving this court's plenary review of the issue on direct appeal. The State responds that Petitioner has failed to prove that counsel was deficient or that he was prejudiced.

I.

*Standard of review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and

application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

## II.

### *Ineffective assistance of counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

-11-

*a. Peremptory challenge*

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution both guarantee the accused the right to trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. The guarantee in the Tennessee Constitution has been interpreted to mean a jury free from "disqualification on account of some bias or partiality toward one side or the other of the litigation." *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003) (quoting *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993)). Peremptory challenges are intended to exclude jurors "suspected of bias or prejudice," while the challenge for cause should be used to exclude potential jurors "whose bias or prejudice rendered them unfit." *State v. Pamplin*, 138 S.W.3d 283, 285-86 (Tenn. Crim. App. 2003) (quoting *Manning v. State*, 292 S.W. 451, 455 (Tenn. 1927) (internal quotation marks omitted). In the context of a direct appeal based upon juror bias, our supreme court has held that, if a juror was not "legally disqualified or there [was] no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced." *George Washington Matthews v. State*, No. W2018-00966-CCA-R3-PC, 2019 WL 1110101, at *7 (Tenn. Crim. App. Mar. 11, 2019) (quoting *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993) (internal citation omitted)). In *George Washington Matthews*, this court cited with approval the Sixth Circuit's conclusion that a petitioner asserting an ineffective assistance claim based upon trial counsel's failure to strike an allegedly biased juror must demonstrate that the juror was actually biased against him. *Id.* (quoting *Holder v. Palmer*, 588 F.3d 328, 339 (6th Cir. 2009) (internal citations omitted)).

In the context of an ineffective assistance of counsel claim, this court has previously concluded that "trial counsel is not required to use all of the allocated peremptory challenges but instead must make 'a strategic decision . . . in order to ensure the best possible jury for his client.'" *Corinio Pruitt v. State*, No. W2019-00973-CCA-R3-PD, 2022 WL 1439977, at *88 (Tenn. Crim. App. May 6, 2022) (quoting *Michael D. Green v. State*, No. E2012-01875-CCA-R3-PC, 2013 WL 6529310, at *8 (Tenn. Crim. App. Dec. 11, 2013)).

The record supports the post-conviction court's finding that trial counsel's decision not to use a peremptory challenge to remove Mr. Hord was tactical. Counsel testified in detail about his reasoning, stating that he had few peremptory challenges remaining, that he told co-defendant Bracey to strike Mr. Hord, and that he believed that the State would strike one or two jurors from the panel, which would have given him the opportunity to back strike Mr. Hord if necessary. Although counsel's strategy was not ultimately successful, we do not second guess tactical decisions that are made based upon adequate preparation. *See Granderson*, 197 S.W.3d at 790. Counsel was not deficient in this regard.

Further, Petitioner has not alleged any facts or provided evidence to indicate that Mr. Hord was actually biased against him or influenced the verdict. Mr. Hord did not testify at the post-conviction hearing, and trial counsel testified only that Mr. Hord had previously worked as a criminal defense attorney and was a Tipton County prosecutor. Counsel opined that Mr. Hord's occupation did not disqualify him as a juror to any greater degree than a defense attorney, and he noted his hope that Mr. Hord's presence on the jury would assist the jurors in applying the correct legal standard of guilt beyond a reasonable doubt. Petitioner has failed to establish that Mr. Hord was biased against him, and he is not entitled to relief on this basis.

### b. Inconsistent theories

Petitioner contends that trial counsel provided ineffective assistance by failing to object to the State's presentation of conflicting theories of guilt as violative of due process protections. Specifically, Petitioner argues that the victims' identifying co-defendant Bracey and Mr. O'Neal as the men who robbed and attacked them is incompatible with the State's reliance on Petitioner's police statement that he was the gunman. Finally, Petitioner seems to suggest that counsel's failure to object resulted in convictions that were based upon Petitioner's uncorroborated statement alone. The State responds that the State's theory was one of criminal responsibility and that trial counsel utilized the inconsistencies in the testimony, some of which came out for the first time at trial, as part of the evolving defense strategy, even though the jury was ultimately "unpersuaded."

Relative to conflicting theories presented by the prosecution, our supreme court has stated that, although a prosecutor may not knowingly present proof to support a false narrative, "[w]hen a prosecutor has conflicting evidence or simply does not know the truth, he 'is entitled to retain skepticism about the evidence he presents and trust the jury to make the right judgment.'" *State v. Housler*, 193 S.W.3d 476, 493 (Tenn. 2006) (quoting *Thompson v. Calderon*, 120 F.3d 1045, 1071 (9th Cir. 1997)).

Although the trial transcript was not exhibited to the post-conviction hearing, Petitioner cites to portions of it in his appellate brief. We choose to take judicial notice of the trial record as contained in Petitioner's direct appeal. *See State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009) (holding, in relevant part, that an appellate court may take judicial notice of a fact even when the trial court fails to take judicial notice) (internal citations omitted).

Our review of the trial record indicates that portions of the victims' trial testimony and photographic lineup identifications varied somewhat from Petitioner's police statement. The trial record reflects that, in the photographic lineups, all three victims circled Mr. O'Neal's photograph. Rogelio wrote that Mr. O'Neal robbed him and his

brothers. Rolando wrote that one person shot his brother and the other used a knife. Ramiro wrote that Mr. O'Neal attacked him and stabbed him with a knife. Ramiro also identified co-defendant Bracey in a second photographic lineup and wrote that co-defendant Bracey shot at Ramiro and pointed a gun at him.

During his trial testimony, Rogelio stated that he circled Mr. O'Neal's photograph because that was the person he remembered. Rolando stated that he circled Mr. O'Neal's photograph because he was the person who had the gun. Ramiro stated that Mr. O'Neal was one of the people who was there, and he described encountering a third man down the street when Ramiro chased after the men to retrieve his identification.

However, the State consistently argued that Petitioner was guilty whether or not he was the gunman because he was criminally responsible for Mr. O'Neal and co-defendant Bracey's actions. As in *Housler*, we do not think the evidence is so incompatible as to constitute separate theories of guilt. 193 S.W.3d at 491-93. We note that *Housler* and similar cases relate to separate prosecutions of different co-defendants, not conflicting evidence in one trial. Petitioner has not established that the State argued incompatible theories such that trial counsel would have had grounds to raise an objection.

Moreover, trial counsel testified at the post-conviction hearing that he utilized the unexpected testimony about a third man to Petitioner's benefit, which enabled counsel to cast doubt on Petitioner's inculpatory admissions while avoiding cross-examination about Petitioner's criminal history and similar pending cases. Counsel strenuously argued the inconsistencies in closing arguments and urged the jury to find the victims' testimony more credible than Petitioner's police statement. Counsel further testified that he would have objected to the inconsistencies during trial if he thought an objection was necessary or an issue needed to be preserved for appeal. Although the post-conviction court did not make a specific finding in this regard, it is apparent from the testimony that counsel acted tactically and adjusted the defense theory in response to new information at trial. Counsel was not deficient, and Petitioner is not entitled to relief on this basis.

## Conclusion

Based on the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

-14-